# Richmond

ABRAM P. STAPLES, ATTORNEY GENERAL OF VIRGINIA V.
HENRY G. GILMER, COMPTROLLER OF VIRGINIA, AND
W. TAYLOE MURPHY, TREASURER OF VIRGINIA.

November 20, 1944.

Record No. 2898.

Present, All the Justices.

The opinion states the case.

*Abram P. Staples, Attorney General,* and *V. P. Randolph, Jr., Assistant Attorney General,* for the petitioner.

*Robert B. Tunstall,* for the respondents.

BROWNING, J., delivered the opinion of the court.

This petition for a writ of mandamus, invoking the original jurisdiction of this court under Chapter 289 of the Acts of Assembly of 1944, involves the validity, under the Constitution of Virginia, of Chapter 287 of the Acts of Assembly of 1944, which establishes a fund for the payment of poll taxes by members of the armed forces of the United States, citizens of Virginia, and provides for their registration under certain conditions.

There are four Acts concerning the matter of elections and voting and the incidents pertaining thereto, as to absentee voting of members of the armed forces, etc., which are Chapters 286, 287, 288 and 289 of the Acts of 1944, and they are together, running consecutively, in the 1944 Supplement to the Code as Sections 220(1) to 220(40), inclusive, all constituting Chapter 14A of the Supplement, entitled "Absentee Voting by Members of Armed Forces and Affiliated Services". Chapter 286 concerns Congressional and Presidential elections; Chapter 287, which is here involved, makes provision for the payment by the State of poll taxes for, and for the registration of, absent voters who are members of the armed forces; Chapter 288, is concerned with state and local elections; Chapter 289 provides for a petition for a writ of mandamus, and forms the basis for this inquiry.

Chapters 286 and 288 have chiefly to do with the qualification of candidates, preparing and supplying ballots, and voting. It is deemed not necessary to detail their extended provisions, except to say that they tie up with what is known as Public Law 712, which is a Federal enactment, dealing with national elections, which exempts voters, who are members of the armed forces, from complying with the election laws of the states requiring registration and the payment of poll taxes by them.

The pertinent provision of Chapter 289, to which we have referred, is:

"In any such proceeding the court shall consider and determine all questions raised by the Attorney General's petition pertaining to the constitutionality or interpretation

of any such act, even though some of said questions may not be necessary to the decision of the question of the duty of said Comptroller and Treasurer to make payments of the money appropriated or directed to be paid."

In Chapter 289 is seen existing in the legislative mind a doubt as to the validity of its enactment, serious enough to invite its test in this court, not only as to the duty of the state officials named to make payments of the money, but as to all questions raised by the Attorney General's petition pertaining to the constitutionality or interpretation of the act. We thus approach the matter through doors wide open as to the issues.

The purpose of the present proceeding, as indicated by the prayer of the petition for mandamus, is to direct the Comptroller of Virginia "to issue warrants upon the State Treasurer to cover such poll taxes of members of the armed forces as he may be requested by invoices drawn pursuant to said Act upon said Comptroller by the Secretary of the Commonwealth," and to direct the State Treasurer "to pay all such warrants."

It should be said that the elections affected by the Act here involved are State and local. The election of President and Vice-President and United States senators and representatives is not involved. The conditions by which they might be affected are not in being.

The sections of the Constitution of Virginia, or the appropriate portions thereof, dealing with the subjects of registration and conditions for voting, are Sections 20 and 21. They are in these words:

"*Section 20.* Who may register.—Every citizen of the United States, having the qualifications of age and residence required in section eighteen, shall be entitled to register, provided:

"First: That he has personally paid to the proper officer all State poll taxes legally assessed or assessable against him for the three years next preceding that in which he offers to register, * * *

"Second: That, unless physically unable, he make application to register in his own handwriting, without aid, suggestion, or memorandum, in the presence of the registration officer, stating therein his name, age, date and place of birth, residence, and occupation at the time and for the one year next preceding, and whether he has previously voted, and, if so, the State, county, and precinct in which he voted last; and,

"Third: That he answer on oath any and all questions affecting his qualifications as an elector, submitted to him by the registration officer, which questions, and his answers thereto, shall be reduced to writing, certified by the said officer, and preserved as a part of his official records."

"*Section 21.* Conditions for voting.—A person registered under the general registration of voters during the years nineteen hundred and two and nineteen hundred and three, or under the last section, shall have the right to vote for the officers elective by the people, subject to the following conditions:

"That unless exempted by section twenty-two, he shall, as a prerequisite to the right to vote, personally pay, at least six months prior to the election, all State poll taxes assessed or assessable against him, under this Constitution, during the three years next preceding that in which he offers to vote. * * * "

This court in the case of *Tilton* v. *Herman*, 109 Va. 503, 64 S. E. 351, was called upon to construe the meaning of the phrase "personally pay," used in Section 20 of the Constitution of Virginia, as applied to the poll tax requirement. ▉ It was there said in part: " * * * he does not personally or 'in a personal manner' pay a debt he owes unless its payment reduces his estate or means to the extent of the payment; and that if this be not the case, but if the debt be paid by another out of that other's means, such debtor could not claim that he had personally discharged the obligation. Where, however, the debtor was the source of the payment and paid the debt because he desired to discharge the obligation out of his own funds, it is, as would seem

clear, a personal payment, no matter by what method or avenue the money is made to reach the hand of the creditor.

"So, as would seem equally clear, where it appears that a voter was the source of the payment of the poll taxes required of him, and paid them out of his own estate or funds because he wished to pay them, it is a personal payment by the voter, * * * ."

Since this inquiry involves particularly the provisions of Chapter 287, let us set them out somewhat in detail.

The preamble, which is explanatory of the purpose of the Act, is as follows:

"Whereas, the Supreme Court of Appeals of Virginia in the case of *Tilton* v. *Herman*, 109 Va. 503, held that in order to constitute a personal payment of poll taxes to render a person eligible to vote, as provided in the Constitution of Virginia, the same should be paid out of the estate of the taxpayer and because he desires or wishes to pay same; and,

"Whereas, the question as to what constitutes the estate of such a taxpayer who is in the active service of the land and naval forces and unable to be personally present in his county or city, and frequently unable to transmit funds with any degree of safety to the treasurer of his city or county for the payment of such taxes, is a question which has not been considered or decided by said Court; and,

"Whereas, it is the desire of the General Assembly of Virginia to provide a fund out of which all poll taxes necessary to be paid to render such members eligible to vote in certain elections may be paid at the request of said members, and also provide for the payment of same out of said fund; and,

"Whereas, the General Assembly also desires to provide means and facilities for the registration by mail of unregistered members in the service in all cases where such registration is necessary; and,

"Whereas, it is desired also to extend said provisions with respect to registration and poll tax payments so as to enable such members to vote in Presidential and Congressional elections in the event of the repeal of the act of Congress desig-

nated as Public Law No. 712, or the nullification thereof by judicial decision; * * * "

The Act then creates what it calls the "Armed service poll tax fund" and appropriates to it money sufficient to pay the poll taxes of members of the armed forces according to its terms. Payments are to be made on warrants of the Comptroller on the Treasurer according to invoices approved by the Secretary of the Commonwealth. The fund is expressly declared to be a part of the estate of each member of the armed forces who may request the expenditure of his share for the payment of his poll taxes.

The Act then provides for the manner in which such request may be made to the Secretary of the Commonwealth, who becomes, by its terms, the agent of the voter for the payment of the money. Registration by the voter is required which is accomplished, if he is not already registered, by what is denominated "temporary registration" provided by a subsequent section, of which, more will be said later.

The fund cannot be regarded as a reward or pension for military service, for it lacks the uniformity which alone would entitle it to that character. The allotment to the individual may be anything from zero to $4.50. The soldier or sailor who requests nothing gets nothing. He who has paid his taxes gets nothing. He who is delinquent, is alone rewarded.

It requires no mental ingenuity to reach the conclusion that the fund created by the Act, out of which the poll taxes are to be paid, is not the source contemplated by the Constitution from which payments of this tax must be made. *Tilton* v. *Herman, supra,* as has been pointed out, holds, in effect, that a payment of the tax from a fund of which the voter is not the source, i. e., which is not his own estate or funds, is not a personal payment by him.

It cannot be said that the statutory declaration, that a fund taken from the public till is a part of the estate of members of the armed forces, who are delinquent in the payment of the poll taxes required to entitle them to exercise the right of suffrage, makes it so. It manifestly is not a

part of his estate—it is not his own. It has none of the indicia of personal ownership. His disposition of it is limited by the fiat of the statute. As was said by the eminent attorney for the respondents: "He cannot collect it, spend it, assign it, give it away, or bequeath it. The 'fund' is self-exhausting. It cannot be taxed. It cannot be accumulated. It disappears as fast as it is created."

As far as the voter's untrammeled control is concerned, it is as evanescent as the fabled isle of Atlantis.

As was said in the respondents' brief, "a mere recital of the facts is stronger than any argument."

The taxes, the payment of which is provided by the Act, are not "personally" paid by the taxpayer, they are not paid by him at all. They are paid by the State out of the public funds to discharge a private debt.

We now come to the registration provisions, Acts of 1944, ch. 287, sections 2 to 6. The application for what is termed "temporary" registration may be made before any commissioned or non-commissioned officer of the army or navy. The forms for such applications are to be prepared by the Secretary of the Commonwealth, with the assistance of the Attorney General, and are to be distributed to members of the armed forces requesting them. These forms are to be accompanied with a list of any questions desired by any or all of the registrars to be submitted to the applicants for registration. It is apparent that the legislative intent was to comply with the third paragraph of section 20 of the Constitution as far as possible.

Sections 31, 32 and 34 of the Constitution provide that registrars of election shall be appointed by electoral boards, that they, along with all other officers, with certain immaterial exceptions, shall be qualified voters, and that they, before entering upon the discharge of their duties, shall take the oath of office. None of these requirements is made applicable by the act in question to the military officers before whom application is made. The act regards as registration officers only the registrars duly appointed and qualified un-

der the laws of Virginia. This is conceded by the Attorney General.

It follows that the provisions of chapter 287 as to registration violate the Constitution of Virginia in at least three respects, to-wit:

(1) It provides for "temporary" registration, and no such character of registration is recognized by the Constitution.

(2) The application to register is not made "in the presence of the registration officer," as required by the second paragraph of section 20 of the Constitution.

(3) The act makes inadequate provisions for questions affecting the applicant's qualifications as an elector which are contemplated by the third paragraph of section 20 of the Constitution.

The language of the respondents' counsel is so highly appropriate that we quote therefrom:

" 'TEMPORARY REGISTRATION'.—No such qualified type of registration is known to the Constitution. The provisions of that instrument as to registration are· as carefully and specifically framed and restricted as the provisions relating to voting. Our citizens are either registered voters or they are not. No immunity from constitutional requirements is gained by characterizing their registration as 'temporary'. The Constitution covers the entire subject of registration, and registration in a manner other than that there prescribed is extra-constitutional and without sanction of law.

"THE APPLICATION FOR REGISTRATION MUST BE MADE IN THE PRESENCE OF THE REGISTRATION OFFICER.—This requirement is expressly laid down in Section 20, paragraph second. It is absolute and without exception. The qualification 'unless physically unable' manifestly refers to a physical inability to make the application in the applicant's own handwriting, not to inability to be present. The purpose is plainly to enable the registration officer, a sworn official of the State, to interview the applicant and see for himself that he complies with the constitutional requirements. This purpose would be wholly defeated if the application were made before a military or naval officer, commissioned or non-

commissioned, having no responsibility to, relation with, or interest in the State of Virginia. The law does not even require this officer to certify that the requirements of Section 20 were observed. He merely certifies that the application was 'subscribed and sworn to' before him.

"A further indication that the phrase 'unless physically unable' does not include an inability to be present is afforded by paragraph third of Section 20, requiring the applicant to answer on oath all questions propounded by the registration officer. This paragraph does not contain the qualifying phrase 'unless physically unable', and thus, as well as for reasons hereinafter pointed out, plainly contemplates the physical presence of the applicant at the time of registration.

"The question involved here was specifically considered by this court in *Moore* v. *Pullem*, 150 Va. 174 (1928), in which the court upheld the validity of the Virginia Absent Voter's Act. In that case the court drew a sharp distinction between Sections 18-21 of the Constitution, relating to the qualifications of voters, and subsequent sections relating to the conduct of elections. As to the former, it said (pp. 188-9):

" 'It is observed, in the first place, that these sections relate specifically and almost exclusively to the qualifications of the voters, and not, except incidentally, to the conduct of elections. They prescribe the qualifications which a citizen must have, and the antecedent preparations he must make before the day of election. They relate to and prescribe the conditions which must be performed before the time of the election in order to qualify the citizen for voting on the day of the election. They are chiefly conditions precedent which cannot be fulfilled on the day of the election.' ·

"The court then held that there was no language in the Constitution imperatively requiring the personal presence of the elector for the purpose of *voting*, and, by way of emphasizing the distinction between registration and voting, cited the case of *Jenkins* v. *State Board of Elections of North Carolina*, 180 N. C. 169, 104 S. E. 346, 14 A. L. R. 1247 (1920). That case, while sustaining the North Carolina Absentee

Voters Law, called attention to the language of the statute reading 'presenting himself for registration', and held that these words plainly required the personal presence of the voter for purposes of *registration*. After calling attention to this, the Virginia court went on to say (pp. 193-4): ·

" 'Because it is so sound, this reasoning may be confidently adopted as applicable in Virginia, for *under section 20 the voter who wishes now to register must present himself in person and make his application in writing in person*, but when the subsequent sections referring directly to the method of voting and the conduct of elections, sections 27, 36 and 56, are scanned, it is found that there is no word in them which requires, or even suggests, that a voter must also then be personally present.' (Italics ours).

"The Attorney General characterizes this language as a 'dictum.' It is a dictum only in the sense that the particular case involved voting rather than registration; but the language must have been carefully weighed, because the distinction between the requirements for voting and for registration was made the very bed rock of the decision.

"QUESTIONS BY THE REGISTRATION OFFICER.—Section 20, paragraph third, requires the elector to answer under oath all questions affecting his qualification as an elector. The 'act under review permits the registrar to have forwarded with the application any questions he desires to ask. But it is clear that this is no substitute for the personal examination contemplated by the Constitution. The questions contemplated by the Constitution are such as might suggest themselves as to each particular applicant, perhaps evoked by his appearance, demeanor, statement, or other act, not more general inquiries such as might be propounded to an absent person half-way around the world from the registration officer."

█ It is readily seen that the Act is a scheme to circumvent the intendment and the terms of the Constitution; and to avoid the State's declared policy. The fact that it was conceived in altruistic motives renders it none the less obnoxious and offensive to constitutional restrictions and limitation.

To be sure no patriotic citizen would withhold any benefit, which could be legally bestowed, from those brave men and women who are giving their all in defense of their country, but to impair our very muniment of sovereignty to do a benign thing would be a disservice.

Back in a day when values in civil government, in America, found initial expression as a polity, this was said by an eminent judge of the United States Circuit Court of Pennsylvania:

"What is a Constitution? It is the form of government, delineated by the mighty hand of the people, in which certain first principles of fundamental laws are established. The Constitution is certain and fixed; it contains the permanent will of the people, and is the supreme law of the land; it is paramount to the power of the Legislature, and can be revoked or altered only by the authority that made it. The life-giving principle and the death-doing stroke must proceed from the same hand. * * * Whatever may be the case in other countries, yet in this there can be no doubt, that every act of the Legislature, repugnant to the Constitution, is absolutely void." *Vanhorne's Lessee* v. *Dorrance*, 2 Dall. (U. S.) 304, 308, 1 L. Ed. 391.

We are mindful of the presumption, invoked by the learned Attorney General, in favor of the constitutionality of legislative enactments, but the conditions of the Constitution and those of the Act are so irreconcilable as to completely flout the presumption.

The offending provisions of the Act are unconstitutional and the mandamus is denied.

*Mandamus denied.*

GREGORY, J., concurring.

The plan devised by the General Assembly, in Chapter 287 of the Acts of 1944, for the registration and the payment of poll taxes by those in the armed services completely contravenes our Constitution and is invalid. It, in effect, attempts to exempt that class from the payment of poll taxes and registration as a prerequisite to voting.

Under section 18 of the Constitution only those citizens who have been registered and who have paid their poll taxes are entitled to vote. The only exception is found in section 22 of the Constitution. There "no person, nor the wife or widow of such person," who served during the late war between the States shall be required to pay a poll tax as a prerequisite to the right to register and vote. Those in the present armed forces were not, and have not been, excepted from the requirement by constitutional amendment.

I do not know why soldiers and sailors in the armed services were not excepted from the constitutional requirement. The framers of the Constitution were bound to have known that we might engage in another war at some future time, and that soldiers and sailors so engaged would be denied their right to vote unless they were excepted from the constitutional requirements. As a matter of fact, when the Constitution was revised in 1928 it had been only ten years since the end of World War I, and an amendment to this section, exempting veterans of that war from the payment of poll taxes, was rejected in both branches of the General Assembly. See Senate Journal, 1927 Ex. sess., p. 245; House Journal, 1927 Ex. sess., p. 76.

It has been nearly three years since the present war began. The next state and local elections do not take place until 1945. If a constitutional amendment to section 22 had been submitted, exempting from the requirement of registration and the payment of poll taxes those in the present armed forces of the United States, there would have been time for the action of two regular sessions of the General Assembly, (1942 and 1944), and a vote of the people on such an amendment prior to the next state and local elections in 1945. Such an amendment might or might not have finally become effective, but, after all, this procedure is the regular and orderly one to be used in amending the Constitution. (Section 196 of Constitution of Virginia.) It certainly cannot be amended by the General Assembly by such means as are described in chapter 287.

The General Assembly possesses no power to create additional exceptions to section 22 of the Constitution. If it could, by legislative act, exempt those in the armed services from the payment of poll taxes and registration as a prerequisite to voting, it could likewise except other large classes, such as all farmers, or all laborers, or all persons over fifty years of age. Thus it could by exception and exemption, do away with the poll tax and registration requirements entirely.

For these additional reasons, I think the mandamus has been correctly denied.

HOLT, J., concurs in this opinion.